CORRECTION



# In the
# Missouri Court of Appeals
# Western District

| | |
|---|---|
| **ED NAPLETON ST. LOUIS IMPORTS, INC., D/B/A ED NAPLETON HONDA,** | **WD84360** |
| Appellant, | **OPINION FILED:** |
| v. | **November 16, 2021** |
| **AMERICAN HONDA MOTOR CO., INC.,** | |
| Respondent. | |

### APPEAL FROM THE ADMINISTRATIVE HEARING COMMISSION

**Before Division Four:**
**Cynthia L. Martin, C.J., Anthony Rex Gabbert and Thomas N. Chapman, JJ.**

Ed Napleton St. Louis Imports, Inc., d/b/a Ed Napleton Honda ("Napleton") appeals the decision of the Administrative Hearing Commission ("AHC") denying Napleton's request for an increase in the warranty parts reimbursement rate paid to it by American Honda Motor Co., Inc. ("Honda"). Napleton raises two points on appeal asserting that the AHC incorrectly applied the requirements of section 407.828 of the Motor Vehicle Franchise Practices Act ("MVFPA"), section 407.810 through 407.835,[1] in denying its request. The AHC's decision is affirmed.

---

[1] All statutory references are to RSMo 2016 as supplemented through the 2018 Cumulative Supplement unless otherwise indicated.

**Factual and Procedural Background**

Napleton is a Honda motor vehicle dealer located in St. Peters in the St. Louis market area. Napleton is part of the Napleton Automotive Group, which has 48 dealerships in eight states, involving 20 different franchises. There are five other Honda dealers in the St. Louis area, which were designated as "Dealer B" through "Dealer F" in the AHC proceedings.

On April 2, 2001, Napleton and Honda entered into a Honda Sales and Service Agreement ("Agreement"), authorizing Napleton to sell and service Honda products. As part of the Agreement, Napleton is obligated to provide labor and parts to satisfy Honda's warranty obligations, and Honda is obligated to provide fair and reasonable compensation to Napleton for the parts used in warranty services.

Nationwide, Honda's standard warranty parts reimbursement rate is cost plus an additional 40% of the cost of the part.[2] Honda dealers may, however, request a reimbursement rate increase from Honda. To do so, the dealer submits 100 sequential, customer-paid repair orders from the last six months that include parts similar to those used in warranty services and a calculation of the average markup on those parts.[3] The dealer must submit documentation identifying the cost and sale price for each Honda part used in calculating the average parts markup percentage. Customer discounts must be included to reflect the actual retail price paid.

Honda reviews the dealer's submissions for deficiencies including failure to include required information and improper inclusion of non-qualifying repair orders or improper

---

[2] Throughout this opinion we refer to the "reimbursement rate" as the portion of the warranty part cost that is added to that cost, when allowing the reimbursement. As an example, a reimbursement rate of 40% includes the total cost of the part plus 40% of the cost of that part – thus a total reimbursement of 140% of the cost of the part.

[3] The markup on warranty parts refers to the portion of the retail sale price as a share above the dealer cost of that part. As an example, a markup of 40% would mean that the dealer is charging its customer the cost of the part, plus an additional 40% of that cost – a retail price that is 140% of the dealer's cost to purchase the part.

exclusion of qualifying repair orders. Honda rejects submissions that contain ten or more deficiencies but gives the dealer an opportunity to resubmit. Honda also reviews submissions for incorrectly calculated discounts and markup rates, and corrects the dealer's requested rate if there are errors.

Honda then reviews the requested rate for reasonableness. It first reviews the approved reimbursement rates for warranty parts in the market and averages those rates. Honda then reviews its iExam database, which contains information from financial statements submitted by Honda dealers. From the iExam database, Honda determines the average markup on customer-paid retail parts (which may include some non-warranty parts) for each dealer in a market over a nine-month period and the overall average markup for the market. If the dealer's reimbursement request is reasonably close to the approved rates and the average markup on retail parts in the market, then Honda approves the request. If the reimbursement request is not reasonable compared to the rates, Honda either denies the request or offers a rebuttal rate that is reasonable. Nationwide, 44% of Honda dealers have never sought a rate increase above the standard 40% reimbursement rate. All Honda dealers are profitable.

Prior to May 2011, Honda was not reimbursing any dealer in the St. Louis market for warranty parts more than the standard reimbursement rate of cost plus 40%. In April 2011, Dealer C submitted a request to Honda for an increase in reimbursement rate, and Honda approved a reimbursement rate of 70.03%. In August 2011, Napleton submitted a request to increase its reimbursement rate to 97.28%, which Honda denied. It submitted another request in November 2011 for a rate of 89.50%, and a reimbursement rate of 75% was approved by Honda. Napleton submitted requests in November 2014 and 2016 to increase its rate to 103.49% and

93.97%, respectively, and those requests were denied by Honda. In December 2016, Honda approved a request by Dealer D to increase its reimbursement rate to 66.70%.

Since 2014, Napleton Automotive Group has had a goal to increase the profitability of the parts business of its dealerships, and has accomplished the goal partly by charging a higher markup on its retail parts. Honda's suggested markup for retail (customer-paid) parts is 66%. The top performing 20% of Honda dealers in the nation mark up retail parts 67 to 75%. Napleton sets its retail prices for parts using a matrix allowing for a markup of 710% for the least expensive parts (1 to 25 cents) and reducing the markup to something "more reasonable" as the cost of the part increases. If a customer objects to the price Napleton charges for Honda parts, Napleton may offer lower-priced aftermarket parts or Napleton branded parts instead, thereby reducing its costs and increasing its profit margin. In 2014, Napleton marked up retail parts by 72 to 79%. By 2017, Napleton had raised retail parts markup to 82%. In 2018, the parts markup increased to 89%; and in the first ten months of 2019, it was 104%. In 2018, the Napleton Automotive Group's parts business alone generated a sales volume of $150 million, with a gross profit of $54 million and a net profit of $24 million.

In September 2018, Napleton submitted a request to increase its warranty parts reimbursement rate from 75% to 87.69%. Honda rejected Napleton's submissions for having too many deficiencies and gave it an opportunity to resubmit the request. In October 2018, Napleton submitted a request to increase the reimbursement rate to 83.84%. Honda again rejected this request due to too many deficiencies as well as the failure to submit final accounting copies of the repair orders in the request. After the second rejection, Honda contacted Napleton to explain why the second request was rejected. Honda never reached the point of reviewing the September and October submissions for reasonableness.

On December 27, 2018, Napleton submitted a third request for increase of its warranty parts reimbursement rate to 90.24%, based on its markup rate for retail (non-warranty) parts. Honda corrected the markup rate to 89%, and then reviewed it for reasonableness.

Honda first reviewed the approved reimbursement rates in the market place and averaged those rates. Three dealerships, B, E, and F, had the standard 40% reimbursement rate because they had never submitted requests for an increase. Napleton, Dealer C, and Dealer D had previously been approved for reimbursement rate increases. Honda averaged the approved rates for Dealer C (70.03%) and Dealer D (66.70%), for an average approved reimbursement rate (for those other area dealerships that had requested increases) of 68.36%.

Honda then reviewed nine months of iExam data from the local dealers to determine actual retail markup. Specifically, it looked at the markup on retail parts for all of the dealers from March to November 2018. Napleton had a retail markup of 90.71% for that time period; Dealer B's markup was 83.52%; Dealer C's markup was 68.79%; Dealer D's markup was 86.21%; Dealer E's markup was 54.87%; and Dealer F's markup was 74.41%. The average markup of Dealers B through F, excluding Napleton, was 73.56%. Including Napleton, the average retail markup was 76.47%. Based upon its review of the approved rates for Dealers C and D and the iExam data of retail parts markups, Honda determined that Napleton's request was unreasonable and denied it on January 24, 2019.

Following Honda's denial of Napleton's December 2018 request, Napleton contacted the other local Honda dealers to discuss their parts markup rates. Shortly after, Honda received requests from Dealers B, E, and F, who were at the standard reimbursement rate, to increase their rates. Dealer B sought a rate increase to 84.53%; Dealer E sought a rate increase to 61%; and

5

Dealer F sought an increase to 90.39%. Honda approved the following rate increases: Dealer B to 76%; Dealer E to 61%; and Dealer F to 75.5%.

On January 29, 2019, Napleton filed its first amended complaint with the AHC asserting that Honda violated the MVFPA by denying its request for an increase of its warranty parts reimbursement rate. After an evidentiary hearing, the AHC issued its decision on February 8, 2021, finding that Napleton was not entitled to an increase of its reimbursement rate to 90.24% for parts used in warranty repairs. This appeal by Napleton followed.

**Standard of Review**

The AHC's decision will be affirmed if: (1) it is authorized by law; (2) it is supported by competent and substantial evidence based on the whole record; (3) mandatory procedural safeguards are not violated; and (4) it is not clearly contrary to the reasonable expectations of the legislature. *Donaldson v. Mo. State Bd. of Registration for the Healing Arts*, 615 S.W.3d 57, 62 (Mo. banc 2020); § 621.193. The AHC's decision will not be upheld if it is arbitrary, capricious, unreasonable, unlawful, or in excess of jurisdiction. *Donaldson*, 615 S.W.3d at 62. The reviewing court defers to the AHC's finding of fact but reviews its determinations of issues of law *de novo*. *Id.* Additionally, the reviewing court defers to the AHC's determinations of witness credibility and the weight given to conflicting evidence. *Id.*

**Analysis**

Napleton raises two points on appeal asserting that the AHC incorrectly applied the requirements of section 407.828 of the MVFPA. "The primary goal of statutory interpretation is to give effect to legislative intent, which is most clearly evidenced by the plain text of the statute." *Gross v. Parson*, 624 S.W.3d 877, 884 (Mo. banc 2021) (internal quotes and citation omitted). Section 1.090 provides that "[w]ords and phrases shall be taken in their plain or

6

ordinary and usual sense." "Accordingly, a word not defined in a statute is given its ordinary meaning pursuant to the dictionary." *Gross*, 624 S.W.3d at 884-85 (internal quotes and citation omitted). The plain and ordinary meaning of the words in a statute is determined from their usage in the context of the entire statute. *State ex rel. Goldsworthy v. Kanatzar*, 543 S.W.3d 582, 585 (Mo. banc 2018). "The legislature is presumed to have intended every word, provision, sentence, and clause in a statute to be given effect." *Id.*

Section 407.812.1 of the MVFPA provides that "[a]ny franchisor obtaining or renewing its license after August 28, 2010, shall be bound by the provisions of the MVFP act and shall comply with it." Section 407.822 sets out the procedure for a franchisee to challenge the actions of a franchisor with the AHC. Under section 407.822.7, "the franchisor shall have the burden of proving by a preponderance of the evidence that it has acted in good faith, that all required notices were given, and that good cause exists for its actions."

Section 407.825 sets out unlawful franchisor practices. It provides, in relevant part:

Notwithstanding the terms of any franchise agreement to the contrary, the performance, whether by act or omission, by a motor vehicle franchisor…of any or all of the following acts enumerated in this section are hereby defined as unlawful practices, the remedies for which are set forth in section 407.835:

* * *

(42) To violate any other provision of the MVFP act that adversely impacts a franchisee.

§ 407.825(42).

In its complaint filed with the AHC, Napleton alleged that Honda had violated section 407.828 of the MVFPA. Section 407.828 provides, in pertinent part:

1. Notwithstanding any provision in a franchise to the contrary, each franchisor shall specify in writing to each of its franchisees in this state the franchisee's obligations for preparation, delivery, and warranty service on its products. **The**

7

**franchisor shall fairly and reasonably compensate the franchisee for preparation, delivery, and warranty service required of the franchisee by the franchisor.** The franchisor shall provide the franchisee with the schedule of compensation to be paid to the franchisee for parts, labor, and service, and the time allowance for the performance of the labor and service for the franchisee's obligations for preparation, delivery, and warranty service.

2. The schedule of compensation shall include reasonable compensation for diagnostic work, as well as repair service and labor for the franchisee to meets its obligations for preparation, delivery, and warranty service….**The primary factor in determining a fair and reasonable compensation for parts under this section shall be the prevailing amount charged for similar parts by other same line-make franchisees in the market in which the franchisee is doing business and the fair and reasonable compensation for parts shall not be less than the amount charged by the franchisee for similar parts to retail customers for nonwarranty parts, provided that such rates are reasonable**….

(emphasis added). Thus, under section 407.828.2, the determination of a fair and reasonable compensation for warranty parts requires a two-part inquiry. First, the prevailing amount charged for similar parts by other same line-make franchisees in the market is identified. Second, the fair and reasonable compensation for parts for other dealers is then compared with the amount the requesting dealer charges retail customers for non-warranty parts. The fair and reasonable compensation for parts cannot be lower than the amount the requesting dealer charges retail customers for non-warranty parts, provided that such rates are reasonable.

Napleton addresses the two factors of section 407.828.2 out of order. It addresses the second factor of the statute (the reasonableness of the amount it charges its retail customers for non-warranty parts) in its first point and asserts that the second factor alone was dispositive. It ostensibly addresses the first factor of the statute (the prevailing amount charged for similar parts by other same line-make franchisees in the market) in its second point, but again primarily focuses on the reasonableness of its requested rate. This opinion will instead address the factors

8

in the order set forth in section 407.828.2, and will accordingly address Napleton's points in reverse order (Point II, then Point I).

Section 407.828.2 of the MVFPA provides that the "primary factor" to consider in determining the amount the franchisor is obligated to reimburse the franchisee for parts used in warranty service is "the prevailing amount charged for similar parts by other same line-make franchisees" doing business in the franchisee's market. § 407.828.2. Section 407.815(13) defines a "line-make" as "a collection of models, series, or groups of motor vehicles manufactured by or for a particular manufacturer…offered for sale, lease or distribution pursuant to a common brand name or mark." The MVFPA does not define the phrase "prevailing amount." Webster's Dictionary defines "prevailing" as "most frequent" and "generally current: COMMON." *Prevailing*, WEBSTERS' THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED (2002).

This definition of prevailing is consistent with the definition applied to the term "prevailing hourly rate of wages" in Missouri's Prevailing Wage Act, which requires that workman employed by a public body engaged in the construction of public works be paid "not less that the prevailing hourly rate of wages." § 290.230.1. Section 290.210(7) defines a "prevailing hourly rate of wages" as "the wages paid generally, to workers engaged in work of a similar character in the locality in which the public works is being performed." In *Central Missouri Plumbing Co. v. Plumbers Local Union*, 908 S.W.2d 366, 371 (Mo. App. W.D. 1995), this court stated that "[t]he method used to calculate the wage is the mode method of statistical analysis." It explained that "the prevailing wage, calculated by using a modal approach, is the most frequently paid actual wage for a person in a given trade." *Id.* (citing *Branson R-IV School Dist. v. Labor & Indus. Rels. Comm'n*, 888 S.W.2d 717, 720 (Mo. App. S.D. 1994)).

9

Thus, under section 407.828.2, the most important factor in determining the fair and reasonable compensation for warranty parts is the most frequent or common rate at which other Honda franchisees in the St. Louis market sell parts similar to those covered under warranty.

As stated above, Napleton asserts that its second point on appeal addresses the first factor in section 407.828.2, however, the majority of its argument in the point focuses on the reasonableness of its requested 90.24% rate (based on its retail markup rate), which is the second factor in section 407.828.2. It asserts, "The AHC's analysis is incorrect, and the proper (and much simpler) way of determining whether a markup rate is reasonable or unreasonable is to determine whether a dealer's customers are willing to pay the charge." Napleton's argument ignores the statutory language that provides that the most important factor in determining the fair and reasonable compensation for warranty parts is the prevailing rate at which other Honda franchisees in the St. Louis market sell warranty-like parts. It does not cite any support for its assertion that a prevailing amount is determined by the amount it charges retails customers. It ignores the statutory text, making no effort to evaluate what amount was the most frequent or common amount charged by other Honda dealers for warranty-like parts. Instead, its argument incorrectly begins and ends with its own business practices.

In determining the prevailing rate at which other Honda franchisees in the St. Louis market sell warranty-like parts, the AHC considered the latest reimbursement rate increase requests submitted to Honda by the St. Louis dealers (including the three requests submitted in 2019 after Napleton's communications). Those rates were 84.53%, 75.26%, 66.7%, 61%, and 90.39% for Dealers B through F, respectively. Because there was not a most frequent or common rate among those five rates, the AHC found that the average of the rates, or 75.58%, fairly and equitably represented the prevailing reimbursement rate. The AHC's decision was

10

supported by competent and substantial evidence based on the whole record and was not arbitrary, capricious, unreasonable, unlawful, or in excess of jurisdiction.

Like Napleton's rate increase request, the rate increase requests of the other dealers were based on customer-paid repair orders from the last six months that included warranty-like parts. As such, the requests were good indications of the rates at which the other Honda dealers in the market sold warranty-like parts. The AHC correctly found that the term "prevailing" was not synonymous with the term "average," and that it would not add language to the statute where the legislature did not intend it. But in this case, because there was no mode or most frequently occurring rate, the average rate, 75.58%, fairly represented the most frequent or common rate. The evidence showed a wide disparity in the rate requests of the dealers, ranging from 61% for Dealer E, the lowest rate, to 90.39% for Dealer F, the highest. While Napleton's requested rate of 90.24% was similar to Dealer B's and Dealer F's rates (84.53% and 90.39%), it was well above the rates of Dealers C, D, and E (75.26%, 66.7%, and 61%). Using the average accounted for all of the dealers' rates in the market. The average of 75.58% was also very similar to the median or middle value of the rates—75.26%, the rate charged by Dealer C. As the midpoint of the rates, there were an equal number of rates greater and less than the median of 75.26%. Because the average and the median of the rates were almost equal, the distribution of the rates was almost even and symmetrical, suggesting that the mode or most common rate was also approximately the same as the average (75.58%) and median (75.26%). The AHC correctly applied the first factor of section 407.828.2.

Napleton's second point is denied.

The second factor of section 407.828.2 (the reasonableness of what Napleton charges retail customers for non-warranty parts) is addressed in Napleton's first point on appeal. It

11

argues that its non-warranty parts markup of 90.24% was reasonable, therefore, section 407.828.2 required that it be reimbursed at that rate.

The second part of the determination of a fair and reasonable compensation for warranty parts provides, "the fair and reasonable compensation for parts shall not be less than the amount charged by the franchisee for similar parts to retail customers for nonwarranty parts, provided that such rates are reasonable." § 407.828.2. "Reasonable" means "being or remaining within the bounds of reason: not extreme: not excessive" and "MODERATE: as (1): not demanding too much…(2): not expensive…(3): that allows a fair profit." *Reasonable*, WEBSTERS' THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED (2002). It is further defined as "[f]air, proper, moderate under the circumstances; sensible." *Reasonable*, BLACK'S LAW DICTIONARY (11th ed. 2019). The MVFPA provides that what is reasonable "shall be based on the circumstances of a franchisee in the market served by the franchisee." § 407.815(19).

Napleton contends that its non-warranty parts markup of 90.24% was reasonable because its customers were willing to pay it. Specifically, it argues,

> [T]he amount Napleton charges its customers is clearly reasonable in that Napleton has sold increasingly large numbers of parts each year in a competitive market where customers could choose any other Honda dealer for parts and service….Napleton has increased its share of the St. Louis Honda parts market by charging what St. Louis consumers clearly believe are fair prices. If Napleton was charging unreasonably high prices for its parts, surely its customers would shop elsewhere for parts. Instead, Napleton is charging what its customers are willing to pay, and it is gaining customers and increasing gross profit in the process.

Napleton posits that, under the MVFPA, reasonableness is limited to its own circumstances. Its definition of reasonable is based solely on its own experience. The MVFPA, however, provides that what is reasonable "shall be based on the circumstances of a franchisee in the market served by the franchisee." § 407.815(19). Under the act, reasonableness considers both the

12

circumstances of the franchisee as well as the market in which it operates. Whether the rate Napleton charges its retail customers for non-warranty parts is reasonable is not solely analyzed in a vacuum, rather its reasonableness must also be considered in relation to the rate charged in the market within which it operates.

In this case, there was substantial and competent evidence on the whole record that supported the AHC's decision that Honda had good cause to find that the actual markup Napleton charged retail customers for non-warranty parts and its related requested reimbursement rate was not reasonable. The evidence showed that Honda conducted a two-part review to test the reasonableness of Napleton's requested reimbursement rate. It first averaged the rates of the two dealers that had previously sought and been approved for reimbursement rates higher than the standard rate—70.03% for Dealer C and 66.70% for Dealer D—for an average approved reimbursement rate of 68.36%. Honda then reviewed nine months of iExam data from the local dealers to determine average retail markup—Napleton had a retail markup of 90.71% for that time period (which was consistent with its requested reimbursement rate of 90.24%); Dealer B's markup was 83.52%; Dealer C's markup was 68.79%; Dealer D's markup was 86.21%; Dealer E's markup was 54.87%; and Dealer F's markup was 74.41%. The average markup from March to November 2018 of Dealers B through F, excluding Napleton, was 73.56%; including Napleton, the average markup was 76.47%. Based on the average approved reimbursement rate of 63.36% and the average markup of all of the St. Louis dealers of 76.47%, Honda determined that Napleton's request of a reimbursement rate increase to 90.24% was not reasonable and denied it.

The evidence further indicated that nationwide, all Honda dealers were profitable despite the fact that 44% of Honda dealers never sought a reimbursement rate increase of the standard

13

40% markup. Additionally, Honda's suggested markup for retail parts was 66%; and the top performing 20% of Honda dealers in the nation mark up retail parts 67 to 75%. Thus, all of the St. Louis dealers, including Dealer E with the lowest approved rate of 61% and the lowest nine-month retail markup of 54.87%, were profitable.

While the AHC was hesitant to equate what was "reasonable" with the average retail markup in an area, it correctly rejected Napleton's argument that the rate it charged its retail customers for non-warranty parts was reasonable because its customers were willing to pay that rate. There is a distinction between what is reasonable and what the market will bear. Just because the market can bear the markup rate does not mean that the markup rate is reasonable. Indeed, the evidence showed that Napleton offered other options for parts (aftermarket or Napleton branded parts) to its customers who found its markup on Honda parts unreasonable.

Honda had good cause to consider a retail markup and reimbursement rate of 75% reasonable. Such rate was consistent with the approved rates and retail markup rates in the St. Louis market as well as the markup rates of the top performing 20% of Honda dealers in the nation. The rate was fair, moderate, and sensible in the marketplace and allowed the Honda dealers to profit. On the other hand, a 90.24% markup, selected for the purpose of yielding the highest profit from customer parts sale and an increased reimbursement rate, was excessive in the market. The AHC correctly applied the second factor of section 407.828.2 in concluding that Honda had good cause in finding Napleton's markup rate of 90.4% unreasonable, and had acted in good faith in denying its request to increase its reimbursement rate accordingly.

Napleton's first point is denied.

**Conclusion**

The AHC's decision is affirmed.

_____
Thomas N. Chapman, Judge

All concur.